IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 38909-0-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| EDWARD M. LEAVENS, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, C.J. — Edward M. Leavens appeals his conviction for first

degree assault—domestic violence. He argues the trial court violated his constitutional

rights by commenting on the evidence and depriving him of his rights to present a

defense, to an impartial jury, to self-representation, and to confront a witness. He

additionally argues the State failed to preserve material exculpatory evidence, and he

raises a cumulative error argument as well as numerous arguments in a lengthy statement

of additional grounds for review (SAG). We disagree with his arguments and affirm.

FACTS

Edward Leavens and his stepbrother Ronald Leavens lived with their mother,

Georgeina Annis, in her Spokane Valley house.[1] At the time of the events discussed

_____

[1] Because the brothers share the same last name, for clarity, we refer to Ronald
Leavens as Ronald and defendant Edward Leavens as Leavens. We mean no disrespect.

below, Ms. Annis was 75 years old, retired, and suffered from dementia. From the time Ms. Annis acquired the home, Leavens lived in a bedroom on the main floor. Ronald moved into the basement in 2021, after separating from his wife.

The morning of September 9, 2021, Ronald left the house and did not return home until later that afternoon. When he returned, he noticed that Leavens was intoxicated, giving their mother a hard time, and limping from a knee injury. Leavens asked Ronald to buy alcohol for him because Rite Aid drug store employees had refused to sell alcohol to him because he was intoxicated. Ronald agreed. The two went to Rite Aid, where Ronald purchased a bottle of whiskey for his brother.

When they arrived back home, Leavens fell out of the car and Ronald helped him to his bedroom. Ronald heard his brother snoring, and assumed he would sleep for the rest of the night. On his way out to the shed to hide the bottle of whiskey from Leavens, Ronald noticed his mother lying in bed and watching television. Once in the shed, Ronald hid the whiskey, smoked cannabis, and fell asleep.

Around 3:00 a.m., Ronald awoke and walked toward the house. The inside house lights were on, which he thought was strange. As he opened the back door to the house, he saw water cascading down the steps. Once inside, he noticed the sink faucets were on, the sink was plugged with a rag, and the water was gushing over the counter onto the floor.

Ronald then noticed his mother sitting in the living room, unresponsive, with lacerations on her head and her wig missing. Blood covered her shirt and the walls. He also saw Leavens' roofing hammer on the floor. Ronald looked through the house for an intruder. He checked his brother's room and noticed he was gone and his bed was made. Ronald then returned to his mother and called 911.

When Spokane County sheriff's deputies arrived, they noticed the living room in disarray, blood everywhere, water covering the floor, and Ms. Annis profusely bleeding from her head. The deputies saw Ronald providing aid to his mother and separated him so they could render aid. Ronald was shaken. The deputies later noticed the hammer with blood on it near the front door.

Ms. Annis was transported to the hospital and taken into surgery to treat multiple lacerations, contusions, hemorrhages, and massive swelling of her brain. A portion of her skull was caved in and had to be removed. She survived her injuries.

Law enforcement interviewed Ronald at the sheriff's office and tried to locate Leavens. Three or four days later, Leavens, who still had not returned home, contacted Ronald's estranged wife, seeking money and clothing. Once Ronald learned of this, he called his brother and confronted him about assaulting their mother. Leavens did not deny assaulting her and said he felt bad about it.

On September 17, law enforcement worked with Ronald's estranged wife for her to arrange a meeting with Leavens in a public location so they could arrest him. When Leavens approached the meeting place, he saw law enforcement and fled, but was quickly captured. Once in custody, Leavens told officers he was not guilty of assaulting his mother and that Ronald was the "'mastermind'" behind the attack. Rep. of Proc. (RP) (Apr. 5, 2022) at 401-02.

*Video-recorded interview of Leavens*

The day of his arrest, Spokane County Sheriff's Office Detectives Dean Meyer and Nathan Bohanek conducted a video-recorded interview of Leavens. Leavens waived his *Miranda*[2] rights. He began the interview by blaming Ronald. He described Ronald as a drug user who forced himself into their mother's house and constantly asked her for money.

Leavens described his actions prior to and after the assault. He said that on September 9, he began the day riding his bike around town. He took the bus to Northern Quest Casino in the afternoon, where he used his player's card to gamble. He said he had two drinks while he gambled and then went to the casino bar where he drank two beers.

He said he left the casino and went to Winco in Spokane Valley around 9:30 p.m. There he purchased two 16-ounce beers and talked with a customer service employee he

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

knew. He then rode his bike home, where he encountered Ronald. He thought Ronald was hiding something and thought perhaps he had been badgering their mother for money. Leavens said he then went to his room, drank one beer, used his computer, and then went to sleep.

Leavens said he awoke and heard Ronald "gaslighting" their mother and trying to make her angry with him (Leavens). Ex. P2, at 27 min., 25 sec. through 28 min., 12 sec. Their mother then began yelling at him (Leavens), calling him lazy and a "prick," and then lost interest and went to bed. Ex. P2, at 28 min., 15 sec. through 28 min., 45 sec. Leavens said he then went back to sleep, but later awoke to noises and what sounded like Ronald pulling their mother into his (Leavens') bedroom. At this point, Leavens realized he was unable to move and felt like he was on an anesthesia drug. He claimed Ronald poured something in something he drank, perhaps Rohypnol. Leavens suggested the detectives should test his hair for the presence of drugs. Later in the interview, Leavens suggested that Ronald had drugged his beer.

Leavens said he heard Ronald yelling and laughing throughout the night. At some point, he heard Ronald yell, "He's got his hatchet." Ex. P2, at 36 min., 10 sec. Leavens said he had a roofing hammer in his bedroom, which he described as similar to a hatchet. He later told the detectives that he kept the roofing hammer in his bedroom closet, but

5

that Ronald had taken it. Near the end of the interview, he claimed Ronald had placed the hammer on his bed and tried to put it into his hand while he was unconscious.

Leavens said when he awoke, he found his mother with blood on her face, scrubbing her blood off the floor with a cleaning product. He thought she had a cut above her eye. She looked at him, asked him, "Why, why, why?," declined his offer to help, and told him to leave. Ex. P2, at 38 min., 20 sec. through 38 min., 30 sec. He then grabbed his belongings and left. He denied seeing Ronald when he left and said he did not think to call 911 because he did not realize how badly his mother was injured.

Leavens said he then went to Mission Park, where he slept all day and the next night. Sometime after he awoke on September 11, he saw Patricia Snarr. He went with Ms. Snarr to Winco, where he purchased alcohol and beers. The pair then went to Ms. Snarr's apartment where they drank together.

Leavens claimed that Ms. Snarr could confirm he did not change his clothes and there was no blood on them. However, he admitted buying new socks and did not deny purchasing new shoes. Later, he said his old shoes and socks might be at Ms. Snarr's house but then claimed he never changed his socks and shoes. He said he then camped in a tent for the next few nights.

Leavens denied going to Rite Aid in the hours before the assault but when the detectives confronted him with surveillance video, witness reports, and a store receipt, he

6

admitted asking Ronald to drive him there to purchase whiskey. At the conclusion of the interview, Leavens said, "Well if I did do this, I don't remember anything, and Ron . . . orchestrated everything." Ex. P2, at 1 min., 50 sec.

After the interview, the detectives investigated Leavens' story. They located his campsite and tent, and after obtaining a search warrant, looked inside the tent and found alcohol and an open box of mustache and sideburn coloring. The detectives reviewed the casino's records and learned that Leavens had not used his player's card to gamble in the hours before the assault, as he had claimed. On October 27, more than one month after the interview, Detective Meyer collected a sample of Leavens' hair to test for the presence of drugs.

The detectives also seized Leavens' cell phone and reviewed its location data. Investigation showed the cell phone did not connect to a cell tower near the casino on the day of the assault. Instead, the cell phone connected to a cell tower near Ms. Annis' house throughout the day of September 9, and moved away from the house at 10:54 p.m. that evening. At 11:11 p.m., the phone connected near where the detectives had found Leavens' campsite.[3]

---

[3] The location data, combined with the jury's guilty verdict, suggests the attack occurred before 11:00 p.m. on September 9, 2021.

DNA testing revealed the presence of Leavens' and his mother's DNA on the hammer. Ronald's DNA was not detected on the hammer.

*Pretrial procedure*

In October 2021, the State charged Leavens with first degree assault and alleged both a deadly weapon and a domestic violence enhancement. At a pretrial hearing two months later, Leavens told the court he wanted to represent himself and he was ready for trial. Later that month, the trial court granted Leavens' motion to discharge his public defender and represent himself. During this hearing, the prosecutor explained that the hair follicle testing would not be complete before the end of January 2022. The court proposed January 24, 2022 as the trial date, but cautioned Leavens that the test results would likely not be ready by that date. The court asked Leavens if he would be willing to move forward without the test results, and Leavens replied that he would. The court set trial for January 24.

*January 3, 2022 readiness hearing*

At the January 3, 2022 readiness hearing, Leavens told the court he was ready for trial, but complained the State had not provided him with discovery about Ronald. Despite this, Leavens declined a continuance and insisted he was ready for trial on January 24 if he received the evidence to be used against him. The court told Leavens he

needed to file any pretrial motions or motions in limine as soon as possible, and that it

planned to hear any motions on January 20.

Leavens then explained he had prepared a witness subpoena list, but he was unable

to get the addresses of his witnesses because law enforcement took his cell phone.  The

court responded:

> THE COURT:  Sir, we will have to see how you can get those
> subpoenas to the court.  Your affidavit needs to indicate what is the
> importance of each one of these witnesses you're requesting for trial is.  If
> it's not clear from what you filed, then you may have to be brought to court
> to address those subpoenas before they just get blanket signed and sent out
> for service.
> . . . .
> THE COURT:  The more information that you can put in your
> affidavit for that subpoena, request for subpoena, that indicates what this
> witness knows and why they're important for trial, the better.

RP (Jan. 3, 2022) at 30.

Leavens agreed, then asked the court whether it received his motion for dismissal.

The court denied seeing the motion and explained to Leavens that he needed to serve the

prosecutor's office, that the clerk's office would not serve the motion for him, and that he

needed to note the motion for a hearing.  Leavens indicated he understood and again

confirmed he was ready for trial on January 24.

On January 18, the State filed and sent its witness list to Leavens. The next day, Leavens filed his subpoena list entitled "Witness Compulsory Process List." Clerk's Papers (CP) at 66-68. Patricia Snarr's name was not on this list.

*January 20, 2022 pretrial hearing*

On January 20, the trial court held a hearing to entertain pretrial motions. The court first explained that, due to a COVID-19 resurgence, it was suspending jury trials for three weeks. The court continued Leavens' trial to February 7. Turning to the pretrial motions, the court asked Leavens if he was ready to proceed with the State's motions or if he needed more time. Leavens stated he needed one week or less to review the motions, so the court continued the hearing to January 27.

The prosecutor alerted the court that Leavens had been attempting to contact the State's witnesses in violation of a court order. The prosecutor explained she had sent Leavens a list of names he was prohibited from contacting. Leavens denied receiving the State's list and explained he had not made any successful telephone calls because he had no money and nobody answered his calls. He asked to be released from jail, complaining that he was only given two hours to review discovery and was unable to adequately defend himself. The court recommended he make his request in a motion to be heard the following week. Leavens never filed such a motion.

*January 27, 2022 continued pretrial hearing*

On January 27, the clerk's office received and filed Leavens' second compulsory process witness list. The list, dated January 18 by Leavens, listed additional witness names, including Patricia Snarr. Also that day, the clerk's office received and filed Leavens' motion to dismiss for a speedy trial violation. The motion included a note for hearing dated January 8, setting a hearing for January 13, dates that had already passed.

At the start of the continued pretrial hearing, the prosecutor noted that Leavens appeared with no paperwork, no writing implements, and no ability to take notes. The prosecutor suggested that Leavens did not come prepared on purpose, to which Leavens responded he was not informed of the nature of the hearing and had no notice of it. Leavens told the court he read the State's motions and was prepared to discuss them and his own motion.

The prosecutor, again, stated her concern that Leavens did not have any materials with him and asked whether he was still representing himself. The court asked Leavens if he intended to continue pro se, to which Leavens replied he did not want standby counsel and was ready for trial. Leavens complained he had only been allowed to look at discovery for an hour and had not been granted any law library time. When Leavens

requested that the video-taped interview of Ronald[4] be admitted as evidence, the court

replied that a lawyer could assist him with his request and noted, "I can't walk you

[through] that process." RP (Jan. 27, 2022) at 33.

Leavens also asked the court about the status of his compulsory witness lists. He

said he struggled to contact people from the jail because he had no telephone, no

telephone book, and no investigator. The court told him an attorney could assist with his

requests and expressed confusion whether Leavens actually was ready for trial. The court

asked Leavens to "send me one signal or the other," "either you're ready or you're not

and it's up to you to make that call." RP (Jan. 27, 2022) at 39. Leavens again stated,

"I'm ready to go to trial." RP (Jan. 27, 2022) at 39. The court told Leavens to continue

to think about it and asked him to discuss his motion to dismiss. After brief argument by

the parties, the court denied Leavens' motion to dismiss.

The court then heard the State's CrR 3.5 motion. After testimony from Detectives

Bohanek and Meyer, and Leavens, the court admitted the statements Leavens made

during his arrest and his recorded interview.

After a recess, the court heard the State's motions in limine. The prosecutor

explained her confusion with Leavens' statements that he was ready for trial but also that

---

[4] The video recording of Ronald's interview with law enforcement is not in the record, is not included in the proposed list of exhibits, and was not introduced during trial.

he needed assistance preparing his case.  The court told Leavens, if he wanted anything, he needed to make a motion or request.

The prosecutor then discussed Leavens' desire to subpoena witnesses.  She explained the State would provide Leavens with blank subpoenas and ensure they were forwarded to the sheriff's office for service.  Leavens agreed to this arrangement.

Leavens then requested an investigator to help trace a COVID-19 relief fund check he believed was cashed by Ronald and evidenced Ronald's motive to assault their mother.  The prosecutor added that a detective would look into that information as a part of the State's obligation to provide potentially exculpatory information to Leavens.  She noted she arranged for Leavens to interview a few of the State's witnesses, even though he had not provided a list of witnesses he wanted to interview.  She also indicated she would try to secure Leavens clothing for trial.

*February 2, 2022 pretrial motion hearing*

On February 2, the parties appeared for another pretrial hearing.  The prosecutor told the court she received a message, dated January 24, from Leavens requesting standby counsel.  She again complained about Leavens contacting the State's witnesses.  She explained that Leavens had interviewed four of the State's witnesses, asked very few questions, and instead was telling the witnesses his theory of his case.  She also told the court that Leavens had not identified any witnesses he needed to interview.

13

After the court asked Leavens about his request for standby counsel, Leavens responded:

> You know, I'm ready to go into trial with what we have as evidence and what I've gathered from collected evidence at the scene. I'm very confident. What I—only reason I wanted stand-in counsel was for procedure, making sure I got what I needed at trial.

RP (Feb. 2, 2022) at 8. In response to the prosecutor's comments about witnesses, Leavens told the court he would like to interview every single witness but did not want a continuance. After more discussion, the court signed an order appointing standby counsel for Leavens.

*February 7, 14, 24 & March 18, 28, 2022 hearings*

On February 7, the parties appeared for another readiness hearing. Leavens' standby counsel was also present. At the time of the hearing, trials were still suspended due to COVID-19, so the parties discussed another continuance and possible trial dates.

The topic of subpoenas also was discussed. Leavens' standby counsel advised the court that none of Leavens' subpoenas had been served. The court and standby counsel agreed that Leavens would have to request the issuance of subpoenas by motion. At the conclusion of the hearing, the court continued the trial date to February 28.

On February 14, the parties appeared for another readiness hearing. Leavens confirmed he was ready for trial on February 28. Nine days later, the court signed an ex parte order appointing Leavens an investigator to assist with witness interviews.

On February 24, the parties again appeared for a readiness hearing. The State moved for an order authorizing a competency evaluation of Leavens pursuant to chapter 10.77 RCW. The court granted the State's motion and stayed the case. On March 18, the State moved to lift the stay after Leavens was found to be competent to stand trial. The court lifted the stay, set a readiness hearing for March 28, and set trial for April 4.

Around this time, Leavens prepared a "*Brady*[5] Material Disclos[ure] Request" motion, in which he requested the State disclose all exculpatory information known to it or in its possession. CP at 138-42. On the accompanying note for hearing form where the scheduled argument date should appear, Leavens wrote "available." CP at 138. It is unclear whether the motion and note for hearing were ever served on the prosecutor's office because no certificate of service is in the record. Although Leavens signed the note for hearing form on March 19, the form and the accompanying motion were not received and filed by the clerk's office until June 14, more than two months after trial concluded.

---

[5] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

15

On March 23, the clerk's office received and filed Leavens' motion for "Material Witness Assistance," and an accompanying note for hearing. CP at 76-77. Leavens signed the note for hearing form on March 18. In the motion, Leavens asserted that Ms. Snarr was a material witness, and requested she "be compelled by the court as witness or possibly afidavit [sic] of fact in a deposition." CP at 76. Leavens again did not include a specific date on the note for hearing, but instead wrote "avail[able]" on the "hearing is scheduled for" line. CP at 77. It is unclear whether the motion was served on the prosecutor's office because no certificate of service is included in the record. On March 28, the parties confirmed they were ready for trial on April 4.

*Trial—day one*

At the start of trial, even though his motions had not been heard, Leavens told the court he was ready to proceed with trial. He then asked the court whether it considered his motion to secure Ms. Snarr's presence to testify. Leavens explained he had talked to his investigator, "and he was going to check on [Ms. Snarr], but we didn't put out a material witness warrant at that time." RP (Apr. 4, 2022) at 120. The court clarified that Leavens was asking about a subpoena, noted it had not seen his motion, then added, "I won't be bringing the witness in. If you want to subpoena them, or whatever you do, that's up to you." RP (Apr. 4, 2022) at 121.

16

After a recess, the court explained to Leavens it was not the court's job to get involved with witnesses and exhibits. Leavens responded, "I had a compulsory list made . . . . Patricia Snarr had been subpoenaed, but she let [the investigator] know she didn't want to appear at trial. She has a medical condition . . . it's embarrassing for her." RP (Apr. 4, 2022) at 145. The court replied, "[w]hat I'm trying to tell you, I had nothing noted to me anytime before this trial or from anyone else. . . . I'm just telling you I'm not involved with the production of your witnesses or exhibits, just so it's really clear." RP (Apr. 4, 2022) at 145-46. After this exchange, the parties proceeded with jury selection, and a jury was seated.

*Leavens' opening statement*

Leavens gave a lengthy opening statement that differed from his police interview. He told jurors that the weekend before the assault, Ronald lost his keys and threatened him with a hammer (different from the one found at the scene of the assault). He explained that his mother gave Ronald money to have new keys made and that she was unhappy when he asked for more money to get the keys programmed.

Leavens told jurors he went to the casino the day before the assault and won money. Afterward, he went to a local store to buy two beers and returned home, where he did not see his mother or Ronald. He went to his room, locked the door, and went to bed. Early the next morning, he saw Ronald acting suspiciously. Leavens told Ronald

17

about his casino winnings, then had his usual glass of water with lemon. The next thing Leavens knew, he was knocked unconscious on the floor and unable to move. Leavens believed his brother drugged him.

Leavens told the jury that Ronald drove him to Rite Aid to purchase alcohol. Leavens said he had blacked out, but recalled Ronald moving him to his room and "rubbing the hammer on my face" and "telling me he'd smash my face in." RP (Apr. 4, 2022) at 256. He claimed Ronald was "really high" and "laughing like a maniac." RP (Apr. 4, 2022) at 257.

Leavens described waking up around 11:00 p.m. that night, paralyzed, and afraid Ronald might kill him. For the next hour, his mother and Ronald verbally berated him. Ronald then grabbed the hammer, placed it in his (Leavens') hand, and then walked away cackling.

Leavens fell back asleep and later awakened to a quiet house, able to move. He went to the living room, where he saw his mother with a minor injury above her eyebrow, scrubbing her blood from the floor. His mother declined his offers of help and told him to leave, so he grabbed his "bug-out bag" and prepared to leave. RP (Apr. 4, 2022) at 264. He went to the garage, where he saw a panicked Ronald holding two hammers.

At this point, the court interjected, "Mr. Leavens, let me help you. Again, you don't need to go into every detail. . . . Finish up the general overview of your story . . . so

18

we can continue on and you can do the testimony or detail later or someone else can. . . .

You don't need to go into all the details."  RP (Apr. 4, 2022) at 265-66.

Leavens continued, explaining that he left the house on his bike and headed to

Mission Park, where he slept in a sleeping bag.  The next day, he encountered Ms. Snarr,

who asked him to buy alcohol for her.  Ms. Snarr saw that there was no blood on him.

Leavens then saw another acquaintance, who told him that the police were looking for

him and suggested he go camping.

After the prosecutor objected, Leavens stated, "I'm summing it up . . . .  I feel like

I'm a survivor that got out of the house."  RP (Apr. 4, 2022) at 270.  The court

interrupted him, "No.  No.  We're not talking about our feelings right now. . . .  We're

talking about what the evidence would show."  RP (Apr. 4, 2022) at 270.  Leavens then

summarized his testimony and concluded by stating the whole incident was orchestrated

by Ronald.

*Trial—day two*

The morning of the second day of trial, juror 2 requested to be excused from the

jury.  The trial court, with the parties present, questioned the juror outside the presence of

the jury.  Juror 2 said he had intrinsic bias from hearing about the case in the news and

based on his personal history and career working with elderly dementia patients.  After an

extended dialogue with the juror, in which the juror said it would be difficult to remain

19

objective but also that he would endeavor to remain objective, the court ultimately

allowed the juror to remain on the jury.[6]

Outside the presence of the jury, the trial court reminded Leavens he was allowed

to question witnesses but not debate them.  The court explained:

> So, again, when you go to question these witnesses, it's not a conversation
> and it's not a debate.  They are questions and answers.  So if you have a
> question, you ask the question.  Whatever the witnesses say, that's the
> answer.  So if you start to have a back and forth with the witness or if
> you're going to get into a debate with the witness, I'll cut you off and I'll
> remind you of our conversation.  I'm telling you up front just to avoid that.
> Again, it is a question and answer.  They say something you don't like in
> the answer, that's the way it is.  That's how the courtroom works.  So I
> don't want to hear you get into a debate or a conversation with somebody
> because that's not what we do in the courtroom, okay?

RP (Apr. 5, 2022) at 290.  The court added that it held lawyers to the same standard.

Leavens replied that he understood.

The State first called Spokane County Sheriff's Deputy Riley Sullivan.  Deputy

Sullivan testified that he responded to the 911 call and described encountering Ms. Annis

and Ronald.  He observed Ms. Annis' injuries, blood throughout the house, and the

hammer with blood on it.

---

[6] Leavens assigns error to the trial court's decision to allow juror 2 to remain on the jury.  For brevity's sake, we include the relevant transcript excerpts in the analysis section for this issue below.

The State next called Ronald.  During Leavens' cross-examination of his brother, the following exchange occurred:

> Q.  (By Mr. Leavens) We established that you had been staying and paying rent.  Now, leading up to this . . . fateful week, I'd say the event I'm going to ask you about is you had keys made for your car on the Labor Day weekend prior to this?
> [THE PROSECUTOR]:  Objection.  Relevance.
> THE COURT:  Sustained.
> THE WITNESS:  Yes, I did.
> THE COURT:  That's okay, sir.  I sustained the objection.
> MR. LEAVENS:  So, Your Honor, I'm trying to establish a fact of my defense and leading up to showing what the atmosphere was in the house.
> THE COURT:  Well, at this point, I don't have any reason to know what the atmosphere—I don't have any reason to believe that the atmosphere—
> MR. LEAVENS:  Okay.
> THE COURT:  —before this date had anything to do with the incident.  If you want to ask questions about the date in question, let's go from there and see where that takes us.

RP (Apr. 5, 2022) at 328-29.  Leavens did not continue this line of questioning and instead asked Ronald about photographs of his bedroom and about Ronald's bloodless slippers.

As Leavens continued cross-examining his brother, the State again objected:

> Q.  (By Mr. Leavens)  So in the dialogue we had, Ron, you say that—
> [THE PROSECUTOR]:  Objection, Your Honor.  Hearsay and outside the scope.
> THE COURT:  Are you asking him about the phone call he testified to?

21

> MR. LEAVENS:  No.  No, I didn't.
> THE COURT:  When you say the dialogue—
> MR. LEAVENS:  Yes.
> THE COURT:  I can't rule on the objection, because I don't know
> what you're asking.
> MR. LEAVENS:  Okay.

RP (Apr. 5, 2022) at 333.  After this exchange, Leavens changed the topic.

Throughout his cross-examination of his brother, Leavens sought admission of various photographic exhibits.  At one point, Leavens showed Ronald a photographic exhibit and stated, "So this is mother's footprint outside my door."  RP (Apr. 5, 2022) at 341.  The prosecutor objected on the basis of assuming facts not in evidence and the court sustained, telling Leavens to ask questions and not testify.

Leavens also sought admission of photographs that show the roofing hammer with dried blood on it.  After Ronald twice stated he had seen the hammer in Leavens' toolbox inside his bedroom closet, Leavens stated, "That is enough on the hammer.  I just wanted to establish that—" and the court interjected, "You don't need to get into—it's fine.  Talk about it later in argument.  You've done what you needed to do was to introduce it."  RP (Apr. 5, 2022) at 343-44.

Leavens next asked his brother about photographic exhibits that show the kitchen and cups sitting on the counter.  Ronald stated that he had seen Leavens drink tea and lemon water out of the cup shown in the exhibits and that he had seen Leavens squeeze

22

lemons and make lemonade in the cup about twice per week.  Leavens did not ask Ronald whether he saw Leavens make lemon water the day of the assault.

Leavens asked his brother whether he was "mad at mom because she wouldn't give you any more money for those keys on Labor Day weekend, that previous weekend?"  RP (Apr. 5, 2022) at 361-62.  The prosecutor objected to "[f]acts not in evidence," which the court sustained.  RP (Apr. 5, 2022) at 362.

After Ronald's testimony, the State called Detective Brandon Wilson.  Detective Wilson testified he searched the shed and was present during Ronald's interview at the precinct.  He testified he saw blood on Ronald's shoulder and ear.

Next, the State called Detective Bohanek.  During cross-examination, Leavens asked Detective Bohanek, "There's been a lot of referral to what went down in this room with conversation through that window."  RP (Apr. 5, 2022) at 426.  The prosecutor objected, "That's not in evidence," and the court sustained.  RP (Apr. 5, 2022) at 427.

The State next called Detective Meyer.  During his testimony, the State sought to admit and play portions of the video recording of Leavens' interview with the detectives after his arrest.  Leavens objected, requesting the video be played in its entirety.  The prosecutor agreed, and the court ruled that the jury could watch the entire two-hour video the following day.

23

*Trial—day three*

On the third morning of trial, Leavens moved for a new trial. He argued the continuances caused witnesses to be absent, their memories to fade, and evidence to spoliate. The court told Leavens it would entertain a motion to dismiss after the State presented its case. After the jury was brought into the courtroom, the prosecutor resumed questioning Detective Meyer and played the entire video of Leavens' interview.

During cross-examination, Leavens asked Detective Meyer about the hair follicle test. Although Detective Meyer had not collected a hair sample before this case, he agreed to take a sample of Leavens' hair because

> Mr. Leavens had expressed in his interview that he was drugged. And as part of the investigation, I have a duty to find exculpatory evidence. And so the attempt of collecting the hair—the time had passed [since the assault], seven days—so when I researched detecting Rohypnol, a blood test would have been best . . . . If Mr. Leavens was contacted that evening or immediately after the incident, we could have done blood. But based off what I had to research that hair follicle samples would demonstrate up to 90 days if there's Rohypnol in his system.

RP (Apr. 6, 2022) at 488. Detective Meyer collected a sample of Leavens' hair using a pair of sterile nail clippers. However, the results returned as inconclusive because Detective Meyer did not provide enough hair sample for the analysis.

After the State rested its case, Leavens moved for a new trial or dismissal. He contended evidence was overlooked and that the continuances caused his witnesses to be

24

unable to testify and their memories to fade. He argued that his brother had provided

three different statements to Deputy Sullivan that were contradictory.

The prosecutor responded that Leavens had received a fair trial, emphasizing that

he had standby counsel, an investigator, and the opportunity to cross-examine his brother.

The court denied Leavens' motion. The court reminded Leavens that he was not required

to testify and that, if he chose to testify, anything he said would become evidence and

could be used against him.

Before the court recessed trial that day, Leavens asked the court about Ms. Snarr.

He told the court her testimony was pertinent to his defense but that she was in the

hospital. He asked the court how to get her deposition or if he should request a material

witness warrant. The court replied, "I'm hesitant to drag somebody out of a hospital with

a warrant, sir." RP (Apr. 6, 2022) at 524. The following exchange occurred:

> MR. LEAVENS: So we could force a subpoena where I guess we can ask for a witness unless she's well enough—I guess she's just getting oxygen treatment—unless she's well enough to testify.
> THE COURT: Well, first of all, I'm going to let you carry the case until tomorrow morning so you can gather any information you want tomorrow. The information is what I have to act on. If I have no idea how long she's going to be in the hospital, I'm not going to leave the question open-ended. Does that make sense? I have no idea whether she's going to be two days, a week or longer.
> MR. LEAVENS: We will know, Your Honor, by morning.
> THE COURT: If she's going to testify, of course I would expect her here tomorrow.

MR. LEAVENS:  She's pivotal to my defense.  And I really—state that, you know, I have had to—we got the warrant to her.  And I knew at this time—

THE COURT:  The subpoena.

MR. LEAVENS:  Yeah, the subpoena—that I didn't want to go to warrant.  Like you said, we aren't going to drag somebody out of the hospital.

THE COURT:  Can you make an offer of proof what she will testify.

MR. LEAVENS:  I do.

THE COURT:  I'm confused.  Your whereabouts before this alleged assault provide a defense?

MR. LEAVENS:  We ran into by chance not long after I left the residence.  I was still confused.  And she's already made a statement to the investigator that . . . I went to her house.  She spent a lot of time with me, and actually spent the night.  And—

. . . .

MR. LEAVENS:  . . .  She will testify to my demeanor, though, what I was wearing, what was described.

THE COURT:  Fair enough.  That at least describes where we're at with it.  Up to you, sir.  If you have her here, fine, you can put her on as a witness, obviously.

MR. LEAVENS:  Could we at this time, then do a motion for a . . . warrant for a material witness?

THE COURT:  As I said a minute ago, without more information, I'm a little reluctant to issue.  You're telling me she's in the hospital having oxygen therapy.  I'm not going to remove—that could be dangerous.

MR. LEAVENS:  Could you help in pursuing her?  I have no means.  My phone doesn't work.

THE COURT:  I can't assist you, sir, in that case. . . .  I'm listening to what you're saying.  I'm taking it at face value.  No problem.  But again, [I am] not very comfortable issuing a material witness warrant to someone in the hospital receiving medical treatment.  I don't want to remove her from that.  I have no idea if that would endanger her health.

MR. LEAVENS:  And we have no way to know she's not exaggerating.

THE COURT:  I'm talking about what you're saying.

MR. LEAVENS: Maybe tomorrow we'll know more. We'll find out.

THE COURT: No problem with that. You can let me know what you find out in the morning. . . .

RP (Apr. 6, 2022) at 524-27.

*Trial—day four*

On the fourth morning of trial, Leavens told the court he would not testify in his defense. Leavens called Misty Duron, who testified she saw Leavens in her pet food shop on September 8, the day before the September 9 assault. After her testimony, Leavens told the court he had no more witnesses, and that "[w]e followed up on Tricia Snarr." RP (Apr. 7, 2022) at 536. Leavens rested his case, then requested that the court allow him to recall Detective Meyer. Leavens did not realize that resting his case meant he could not call additional witnesses. The court nevertheless allowed Leavens to recall Detective Meyer. After Detective Meyer testified, Leavens rested his case.

Before closing arguments, the court warned Leavens he could "only argue from things that were admitted into evidence. By that I mean testimony that came in or the exhibits." RP (Apr. 7, 2022) at 563. During Leavens' closing argument, the court interrupted and told him to argue from the evidence when he spoke about a photograph that was not in evidence and again when he suggested that witnesses did not show up because of the delayed trial date. When Leavens said that his mother's house was

27

"hostile and every night I locked myself in my room, probably for about a year," the prosecutor objected to "[f]acts not in evidence," and the court sustained. RP (Apr. 7, 2022) at 590.

Leavens then spoke about his theory that Ronald drugged his lemon water:

> That is my glass on the counter. And it's the colorful one with the rings that look kinda red, orange, blue. That's my cup. . . . Every morning I'd squeeze a lemon into water in that glass. The last I seen Ron that morning is he was on the other side of the table. I had the glass full of water. I used distilled water. I walked around him to the kitchen, right there around that counter, then I cut the lemon in half. This is the last memories I have. I walked back around that counter. Ron was by that chair right there, and he was just looking, watching me, and I went and squeezed that lemon. I used a fork, then I squeezed into the cup.

RP (Apr. 7, 2022) at 591-92. The prosecutor objected, stating, "None of this is in evidence," and the court sustained, struck the comments, and told the jury to disregard them. RP (Apr. 7, 2022) at 592. The court told Leavens, "Mr. Leavens, listen to me. There is no evidence about this drink." RP (Apr. 7, 2022) at 592. Leavens argued, "Well, I drank my lemonade. I do every morning." RP (Apr. 7, 2022) at 593. The court responded, "Sir, again, we have covered this, you and I. There was no testimony on this. The argument has to be from the testimony. There was no testimony about a drink with lemons." RP (Apr. 7, 2022) at 593.

Leavens continued and later spoke about seeing his brother with two hammers in his lap. The prosecutor objected to facts not in evidence, and the court sustained.

28

Leavens told the jury he watched Ronald take the hammer from his room. The prosecutor again objected, and the court said, "that was not testified to. There was nothing about it. Strike the hammer—." RP (Apr. 7, 2022) at 607. Leavens replied, "That hammer was taken from my room," and the court responded, "Sir, there's no evidence of that in the trial." RP (Apr. 7, 2022) at 607.

When Leavens attempted to discuss Deputy Sullivan's testimony about what Ronald told him, the prosecutor again objected to facts not in evidence. The court "[s]ustained as to what Officer Sullivan said. It was not in evidence. . . . Officer Sullivan did not testify. His statement is not in evidence, sir." RP (Apr. 7, 2022) at 607-08. After the State's rebuttal and after the jury had been sent to deliberate, the court clarified that it misspoke about Deputy Sullivan:

> Also, I misspoke, as well, when we were in the middle of the objection. I think it was Deputy Sullivan didn't testify. He did testify; he didn't testify as to the particular statement that was being made at the time in argument that I sustained the objection in relation to. So didn't complete my entire thought; that was a correction I needed to make.

RP (Apr. 7, 2022) at 618.

*Verdict, sentencing, and posttrial motions*

The jury found Leavens guilty of first degree assault, and answered yes on the deadly weapon and domestic violence special verdicts.

On April 29, 2022, the court sentenced Leavens to 147 months of confinement. At the conclusion of sentencing, Leavens told the court he had submitted motions to arrest judgment and for a new trial. The court told Leavens that the motions had not been served on his office.

Leavens' envelope for the motion to arrest judgment was dated April 11, and his envelope for the motion for a new trial was dated April 13. Yet the motions for the late April sentencing hearing were not received by the administrator's office until May 11 and by the clerk's office until June 14.[7]

Leavens filed a timely notice of appeal. He also filed a notice of discretionary review seeking relief from judgment and requesting a new trial. In his notice for discretionary review, he claimed (1) Ms. Snarr told standby counsel she would not appear for trial because she was ill, (2) the trial court denied standby counsel's request for a recess to verify Ms. Snarr's condition, and (3) the State did not call two forensic investigators on its witness list that were favorable to him.

---

[7] In a May 19, 2022 letter to the court, Leavens described the inmate mail as "unreliable," and complained it took three weeks for his motions to be filed. CP at 125-26.

ANALYSIS

A.    JUDICIAL COMMENTS ON EVIDENCE

Leavens contends the trial court violated article IV, section 16 of the Washington Constitution by making improper comments on the evidence.  We disagree and discuss each alleged instance after review of the relevant standards.

Although Leavens did not object to any of the trial court's purported comments, a judicial comment on the evidence is an error of constitutional magnitude that can be raised for the first time on appeal.  *State v. Sivins*, 138 Wn. App. 52, 59, 155 P.3d 982 (2007); RAP 2.5(a)(3).

Article IV, section 16 of the Washington Constitution provides, "[j]udges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law."  In other words, judges are prohibited from commenting on the evidence.  A court comments on the evidence if the court's attitude toward the merits of the case or the court's evaluation relative to the disputed issue is inferable from the statement.  *State v. Lane*, 125 Wn.2d 825, 838, 889 P.2d 929 (1995); *State v. Levy*, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006).  The touchstone of error in a trial court's comment on the evidence is whether the feeling of the trial court as to the truth value of the testimony of a witness has been communicated to the jury.  *Lane*, 125 Wn.2d at 838.  This important constitutional

principle serves to protect the jury from being unduly influenced by the court's opinion on the credibility, sufficiency, or weight of the evidence. *Sivins*, 138 Wn. App. at 58.

Washington courts use a two-step analysis to determine whether reversal is required due to a judicial comment on the evidence. *Levy*, 156 Wn.2d at 723-24. To ascertain whether a court's conduct or remark rises to a comment on the evidence, a reviewing court examines the facts and circumstances of the case. *Sivins*, 138 Wn. App. at 58. If there was a judicial comment, it is presumed to be prejudicial, and the burden is on the State to show that the defendant was not prejudiced, unless the record affirmatively shows that no prejudice could have resulted. *Levy*, 156 Wn.2d at 723.

However, when ruling on objections, a trial court has the right to give the reasons for its ruling and those reasons will not be treated as a comment on the evidence. *State v. Cerny*, 78 Wn.2d 845, 855-56, 480 P.2d 199 (1971), *vacated in part*, 408 U.S. 939, 92 S. Ct. 2873, 33 L. Ed. 2d 761 (1972). In addition, juries are instructed, as was the jury in this case, that the trial court can have no opinion on the facts of the case and that anything said by the court with respect to objections made during trial must not be taken as the opinion of the court as to the facts or as expressing any opinions of the court thereon. *Id.* at 856. The jury is presumed to follow the court's instructions. *State v. Willis*, 67 Wn.2d 681, 686, 409 P.2d 669 (1966).

Mr. Leavens contends the trial court improperly commented on the evidence in the following instances:

*First instance—Deputy Sullivan's testimony*

Leavens contends the trial court commented on evidence during closing argument when it stated Deputy Sullivan did not testify. We disagree.

During closing argument, when Leavens attempted to discuss Deputy Sullivan's testimony about statements Ronald made to him, the prosecutor objected to facts not in evidence. In fact, neither the State nor Leavens had questioned Deputy Sullivan during trial about Ronald's statements to him. The court "[s]ustained as to what Officer Sullivan said. It was not in evidence. . . . Officer Sullivan did not testify. His statement is not in evidence, sir." RP (Apr. 7, 2022) at 607-08.

The State argues the trial court did not comment on evidence because its statement did not pass on the truth value of any testimony. The State contends the trial court was referencing the statements Leavens claimed his brother made to Deputy Sullivan in Leavens' motion to dismiss, but Deputy Sullivan did not actually testify to those statements during trial.

The State notes that the trial court, soon after its ruling, admitted it misspoke when it said Deputy Sullivan did not testify. The court corrected itself and said Deputy Sullivan *did* testify and explained it meant to refer to a particular statement Leavens tried

33

to attribute to Deputy Sullivan's testimony. The jury never heard this correction.

Nevertheless, we agree with the State that the trial court did not comment on the evidence. The court's attitude toward the merits of the case is not inferable from the comment nor are the court's feelings about the case implied from the comment. Moreover, Deputy Sullivan did not testify about statements Ronald made to him. We view the trial court's comments as an explanation, although imperfect, for why it sustained the State's objection. Such explanations are not comments on the evidence. *Cerny*, 78 Wn.2d at 855-56.

*Second instance—the hammer*

Leavens contends the trial court commented on evidence during closing argument when it sustained the State's facts-not-in-evidence objection to his statements about his brother taking the hammer. We disagree.

During Leavens' recorded interview, he told officers he kept the hammer in the closet in his room, and that "Ron took it." Ex. P2, at 45 min. through 45 min., 25 sec. However, during closing argument, Leavens said he *watched* Ronald take the hammer from his room. The State objected, and the court told Leavens: "that was not testified to. There was nothing about it. Strike the hammer—." RP (Apr. 7, 2022) at 607.

The State argues there was no evidence at trial that Leavens said he saw Ronald take the hammer from his room. The State is correct, and the trial court properly

34

sustained the State's objection. In addition, the court made its comment to explain why it

sustained the State's objection, and we do not treat such explanations as comments on the

evidence. *Cerny*, 78 Wn.2d at 855-56.

*Third instance—lemon water*

Leavens contends the trial court commented on evidence during closing argument

after it sustained the State's facts-not-in-evidence objection to his argument that his

brother watched him squeeze a lemon into a glass of water the morning before the

assault. We disagree.

During his closing argument Leavens told the jury about his theory that Ronald

drugged his lemon water:

> MR. LEAVENS: . . . Every morning I'd squeeze a lemon into water
> in that glass. The last I seen Ron that morning is he was on the other side
> of the table. I had the glass full of water. I used distilled water. I walked
> around him to the kitchen, right there around that counter, then I cut the
> lemon in half. This is the last memories I have. I walked back around that
> counter. Ron was by that chair right there, and he was just looking,
> watching me, and I went and squeezed that lemon. I used a fork, then I
> squeezed into the cup.
> [THE PROSECUTOR]: I'm sorry. Objection. None of this is in
> evidence.
> THE COURT: None of that is in evidence.
> . . . .
> THE COURT: Mr. Leavens, listen to me. There is no evidence
> about this drink.
> . . . .
> THE COURT: I'm going to strike your comments and tell the jury
> to disregard them.

> MR LEAVENS:  That is my cup there.  My last memory is making my lemon juice—
> [THE PROSECUTOR]:  Standing objection.
> MR. LEAVENS:  —drinking my cup.
> THE COURT:  Sustained.
> MR. LEAVENS:  Well, I drank my lemonade.  I do every morning.
> THE COURT:  Sir, again, we have covered this, you and I.  There was no testimony on this.  The argument has to be from the testimony.  There was no testimony about a drink with lemons.

RP (Apr. 7, 2022) at 592-93.

Leavens argues the trial court improperly commented on the evidence during this exchange.  He contends there was testimony about him making lemon water.  His contention, although true, does not help his argument.

Although Ronald did testify that Leavens made lemon water about twice per week, he did not testify to seeing Leavens make lemon water on the day of the assault.  Nor was there evidence that Leavens' last memory was squeezing lemon into a glass of water the morning before the assault.  Regardless, the court's comment explained its ruling for sustaining the State's objection, and we will not treat such explanations as comments on the evidence.  *Cerny*, 78 Wn.2d at 855-56.

*Other comments during closing arguments and cross-examination*

Leavens contends the trial court improperly commented on six other occasions during his cross-examination of Ronald and during closing argument when it sustained the prosecutor's objections to facts not in evidence.  He contends the trial court should

36

not have stated the facts were not in evidence and should have instead stated that the parties' comments were not in evidence. He offers no authority for the proposition that the trial court should have rephrased its rulings on the objections. Nevertheless, again, the trial court was permitted to rule on objections and we will not treat its rulings as comments on the evidence. *Cerny*, 78 Wn.2d at 855-56.

Leavens also contends the trial court's interruption during his cross-examination of his brother constituted an improper comment on the evidence. We disagree.

After Ronald twice testified that he had seen the hammer in Leavens' toolbox in his bedroom closet, Leavens stated, "That is enough about the hammer. I just wanted to establish that—," and the court interjected, "You don't need to get into—it's fine. Talk about it later in argument. You've done what you needed to do was to introduce it." RP (Apr. 5, 2022) at 343-44.

The trial court sensed that Leavens was about to argue the importance of his brother knowing where he kept his hammer. The purpose of examining a witness is to elicit facts, not to argue facts. Closing argument is where one argues about facts elicited and why those facts require the jury to reach a particular result. The trial court did not err by explaining this to Leavens.

B.     MATERIAL WITNESS WARRANT AND DEPOSITION

Leavens contends the trial court infringed on his constitutional right to compulsory process and his right to present a defense by refusing to issue a material witness warrant or order a deposition of Ms. Snarr.  We disagree.

Both the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee a criminal defendant the right to present testimony in one's defense and the right to compulsory process to compel the attendance of witnesses.  *State v. Hudlow*, 99 Wn.2d 1, 14, 659 P.2d 514 (1983); *State v. Maupin*, 128 Wn.2d 918, 924, 913 P.2d 808 (1996).  "'The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense.'"  *Maupin*, 128 Wn.2d at 924 (quoting *Washington v. Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967)).

However, neither the right to compulsory process nor the right to present a defense is absolute.  *State v. Thomas*, 150 Wn.2d 821, 857, 83 P.3d 970 (2004).  The availability of the right to compulsory process is wholly dependent on the defendant's initiative. *Taylor v. Illinois*, 484 U.S. 400, 410, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988).  The defendant bears the burden of establishing the materiality, relevance, and admissibility of the proposed testimony.  *State v. Roberts*, 80 Wn. App. 342, 351, 908 P.2d 892 (1996) (citing *State v. Smith*, 101 Wn.2d 36, 41, 677 P.2d 100 (1984)).

"In order for the right to be violated, the 'sovereign's conduct' must impermissibly interfere with the right to mount a defense." *State v. McCabe*, 161 Wn. App. 781, 787, 251 P.3d 264 (2011) (quoting *United States v. Theresius Filippi*, 918 F.2d 244, 247 (1st Cir. 1990)). The contested act or omission must be attributable to the sovereign, and it must cause the loss or erosion of material testimony that is favorable to the accused. *Id.* The right is not violated where "the obstacle to a defendant's getting what he perceives as the full benefit of his Sixth Amendment right is not government interference, but an uncooperative witness." *Id*. Whether denial of the request to issue a material witness warrant rises to the level of a constitutional violation requires a case-by-case inquiry. *State v. Downing*, 151 Wn.2d 265, 275, 87 P.3d 1169 (2004).

We review a trial court's decision to deny a motion for issuance of a material witness warrant for a manifest abuse of discretion. *City of Bellevue v. Vigil*, 66 Wn. App. 891, 895, 833 P.2d 445 (1992). In exercising its discretion to grant or deny a request for compulsory process, the trial court may consider a number of factors, including surprise, diligence, materiality, and maintenance of orderly procedure. *State v. Edwards*, 68 Wn.2d 246, 255, 412 P.2d 747 (1966); *State v. Schaffer*, 70 Wn.2d 124, 129, 422 P.2d 285 (1966); *State v. Eller*, 84 Wn.2d 90, 95, 524 P.2d 242 (1974).

*Invited error/waiver*

As a threshold issue, the State contends Leavens invited or waived[8] this error. We

agree that Leavens invited the error.

Under the invited error doctrine, a party who sets up an error at trial cannot claim

that very action as error on appeal. *State v. Momah*, 167 Wn.2d 140, 153, 217 P.3d 321

(2009). An error is invited when the party affirmatively assents to the error, materially

contributes to it, or benefits from it. *State v. Mercado*, 181 Wn. App. 624, 630, 326 P.3d

154 (2014). Invited errors are unreviewable even when they implicate constitutional

rights. *State v. Carson*, 179 Wn. App. 961, 973, 320 P.3d 185 (2014), *aff'd*, 184 Wn.2d

207, 357 P.3d 1064 (2015).

---

[8] Although the State contends Leavens waived this error, its arguments only
concern the invited error doctrine. The State cites no rules for the applicability of the
wavier doctrine in criminal cases and provides no analysis on whether the constitutional
right to compulsory process can be waived.

In general, constitutional rights in criminal cases may only be waived by knowing,
intelligent, and voluntary acts. *See State v. Stegall*, 124 Wn.2d 719, 724, 881 P.2d 979
(1994). The validity of any waiver of a constitutional right, as well as the inquiry
required by the court to establish waiver, will depend on the circumstances of each case,
including the defendant's experience and capabilities. *Id*. at 725. Moreover, the inquiry
by the court will differ depending on the nature of the constitutional right at issue. *Id*.

Because the State does not cite or analyze these rules in the context of the right to
compulsory process, we decline to address this argument further. "Passing treatment of
an issue or lack of reasoned argument is insufficient to merit judicial consideration."
*Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998).

As explained below, Leavens materially contributed to the purported error. On the third day of trial, after the State rested but before Leavens opened his case, Leavens asked the court to issue a material witness warrant for Ms. Snarr or order her to be deposed. He explained that she could testify about his demeanor on September 10, the day after the assault.

He explained that Ms. Snarr, currently, was hospitalized and receiving oxygen. The trial court explained it was "hesitant to drag somebody out of a hospital with a warrant," said it would recess trial to the next morning, and asked Leavens to find out how long she might be in the hospital. RP (Apr. 6, 2022) at 524. Leavens responded he would know more by the next morning. Before recessing, Leavens repeated his request for a material witness warrant. The trial court again explained, "As I said a minute ago, without more information, I'm a little reluctant to issue. You're telling me she's in the hospital having oxygen therapy. I'm not going to remove—that could be dangerous." RP (Apr. 6, 2022) at 526.

The next morning, Leavens called a witness who testified she saw him on a Wednesday in September. On cross-examination, the witness testified she would not be surprised that the Wednesday would have been September 8, but she would have to look at a calendar.

41

After the trial court excused the witness, it asked Leavens if he had any other witnesses. Leavens responded, "We don't. We followed up on Tricia Snarr." RP (Apr. 7, 2022) at 536. The trial court interjected, "Without telling me more, does the defense rest?" Leavens responded, "Defense rests." RP (Apr. 7, 2022) at 536. Leavens' decision to not have Ms. Snarr testify materially contributed to the trial court not issuing a material witness warrant or ordering her deposition.

C.    BIASED JUROR

Leavens contends the trial court violated his constitutional right to a fair and impartial jury by failing to remove juror 2, sua sponte, from the jury during trial. We disagree.

Under the federal and state constitutions, a criminal defendant has a right to a fair and impartial jury. *State v. Rupe*, 108 Wn.2d 734, 748, 743 P.2d 210 (1987) (citing U.S. CONST. amend. VI; WASH. CONST. art. I, § 22). This right is violated by the inclusion of a biased juror on the jury. *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 30, 296 P.3d 872 (2013). Generally, a defendant waives the issue of a biased juror on appeal by failing to raise an objection to a juror in the trial court. *State v. Tharp*, 42 Wn.2d 494, 501, 256 P.2d 482 (1953). However, if the record demonstrates the bias of a juror, seating the biased juror was, by definition, a manifest constitutional error that can be raised for the first time on appeal. *See State v. Irby*, 187 Wn. App. 183, 193, 347 P.3d

1103 (2015); RAP 2.5(a)(3). "Because '[t]he presence of a biased juror cannot be harmless,' seating an actually biased juror 'requires a new trial without a showing of actual prejudice.'" *State v. Guevara Diaz*, 11 Wn. App. 2d 843, 851, 456 P.3d 869 (2020) (internal quotation marks omitted) (quoting *United States v. Gonzalez*, 214 F.3d 1109, 1111 (9th Cir. 2000)).

The trial judge has an obligation to excuse a juror where grounds for a challenge for cause exist, such as bias, even if neither party challenges that juror. *Id.* at 855; RCW 2.36.110. Because the trial court is in the best position to determine a juror's ability to be fair and impartial, we review a trial court's decision not to dismiss a juror for manifest abuse of discretion. *Guevara Diaz*, 11 Wn. App. 2d at 856; *see also State v. Noltie*, 116 Wn.2d 831, 838-40, 809 P.2d 190 (1991). A trial court abuses its discretion when it bases its decision on untenable grounds or reasons. *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995).

"When a juror makes an unqualified statement expressing actual bias, seating the juror is a manifest constitutional error." *Irby*, 187 Wn. App. at 188. "Actual bias is 'the existence of a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging.'" *Id.* at 193 (quoting RCW 4.44.170(2)). "If it appears that a juror has formed an opinion, 'such

43

opinion shall not of itself be sufficient to sustain the challenge, but the court must be satisfied, from all the circumstances, that the juror cannot disregard such opinion and try the issue impartially.'" *Id.* (quoting RCW 4.44.190).

However, equivocal answers alone do not require a juror to be removed. *Noltie*, 116 Wn.2d at 839. Rather, "the question the trial court must answer is 'whether a juror with preconceived ideas can set them aside.'" *Guevara Diaz*, 11 Wn. App. 2d at 856 (quoting *Noltie*, 116 Wn.2d at 839).

Here, on the second day of trial, juror 2 requested to be excused. Outside the presence of the other jurors, juror 2 told the court and the parties that he had intrinsic bias from hearing about the case in the news and based on his personal history from childhood and his "career path." RP (Apr. 5, 2022) at 284.

The court asked the juror "whether [he could] set those aside, judge this case on its own merits, make the decision on this case and then move on or not." RP (Apr. 5, 2022) at 284. Juror 2 replied he could and said he would endeavor to be objective, but added he had seen similar assaults in his profession and that it would "be hard for me to remain objective." RP (Apr. 5, 2022) at 285. Juror 2 explained he grew up in a long-term care facility, had a "very passionate infinity [sic]" for the elderly, began his career working in the dementia and Alzheimer's units in long-term care facilities, and that his patients were an extension of his life's work and family. RP (Apr. 5, 2022) at 285.

The court again told the juror that if he did not think he could be fair, to let the court know. Juror 2 responded that he would try, but added "it would be a challenge." RP (Apr. 5, 2022) at 286. The dialogue continued:

> THE COURT: Okay. Well, [juror 2], if you feel you can move forward and hold the State to their burden, you can listen to the evidence objectively and it's not going to be overwhelmed by your life experiences, then that meets the test for me for you to stay on the jury. That's where I would come from. Again, we all bring our life experiences. The question is can we set them aside and look at the facts in this case, whatever they turn out to be, and then make that decision. Obviously, some people can't do that and that's perfectly understandable.
> JUROR NO. 2: Yeah. I guess without hearing more evidence and testimony, I don't know how I'm going to respond. I feel like I can handle it and I can be objective. *But until I hear everything and experience everything, I'm not sure.*

RP (Apr. 5, 2022) at 287-88 (emphasis added). The court ultimately allowed juror 2 to remain on the jury panel.

Leavens argues that the trial court should have removed juror 2. He points to the emphasized language above and argues that juror 2's last statement was a statement of partiality. The State responds that the trial court did not abuse its discretion by not removing juror 2 because juror 2 made assurances of impartiality and the trial court satisfied itself that he could set his preconceived ideas aside. We agree with the State.

Although juror 2 said he could be objective and hold the State to its burden, he also said he could not be sure until he heard everything. Juror 2's response is similar to

45

responses often made by careful and thoughtful jurors. A trial court is not required to excuse a juror simply because the juror is not "sure" the facts of a violent crime will not bias them. Rather, the trial court must remove a juror if the trial court is not satisfied they can set biases aside.

While preconceived ideas against a defendant's race or nationality are insidious and a trial court cannot reasonably find those could be set aside, preconceived ideas based on the type of crime or victim pose a different challenge for courts to assess. Jurors who have personally experienced rape, incest, and other violent crimes are less capable of setting their personal traumas aside to be impartial. But jurors with strong empathy or affinity for victims of violent crimes are more capable of being impartial than those with personal traumas. Were we to conclude otherwise, a disproportionate number of conscientious people would be excluded from jury service. We discern no abuse of discretion from the trial court's determination that juror 2 could set aside his preconceived ideas and be impartial.

### D.    FAILURE TO PRESERVE EVIDENCE

Leavens contends Detective Meyer violated his constitutional rights to due process and to present a defense by failing to obtain a sufficient hair sample to test for the presence of Rohypnol.  We disagree.[9]

Under the Fourteenth Amendment to the United States Constitution, criminal prosecutions must conform with prevailing notions of fundamental fairness, and criminal defendants must have a meaningful opportunity to present a complete defense.  *State v. Wittenbarger*, 124 Wn.2d 467, 474-75, 880 P.2d 517 (1994) (citing *California v. Trombetta*, 467 U.S. 479, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984)).  Our State's due

---

[9] The State contends we should not review this argument because this claim of error is being raised for the first time on review, and the error is not "manifest" within the meaning of RAP 2.5(a)(3).

Generally, we will not review a claim of error raised for the first time on review.  RAP 2.5(a).  One of this general rule's three exceptions permits review of an unpreserved "manifest error affecting a constitutional right."  RAP 2.5(a)(3).  For an error to be "manifest" under this rule, the appellant must show "actual prejudice."  *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007).  If the record is insufficient to show actual prejudice, the error is not manifest and review is not warranted.  *Id.*

Here, because the State's agent obtained an insufficient quantity of hair, it is not possible to know if the hair would have tested positive for Rohypnol.  Thus, Leavens cannot show actual prejudice.  However, it would be unjust for us to decline review of Leavens' claim if his inability to obtain review was due to State misconduct.  RAP 2.5(a)(3) is a discretionary rule, and a court may waive its application if it would produce an unjust result.  *See State v. Blazina*, 182 Wn.2d 827, 834-35, 344 P.3d 680 (2015).  To avoid a potential unjust result, we review this claim of constitutional error.

process clause extends the same protection regarding this right as does its federal

counterpart. *Id.* at 474 (citing WASH. CONST. art. I, § 3).

To comport with due process, the State has a duty to disclose material exculpatory

evidence to the defense and a related duty to preserve such evidence for use by the

defense. *Id.* at 475 (citing *Brady*, 373 U.S. 83). To determine if a failure to preserve

exculpatory evidence amounts to a denial of due process, we apply the standard set forth

in *Arizona v. Youngblood*, 488 U.S. 51, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988). *State*

*v. Ortiz*, 119 Wn.2d 294, 301, 305, 831 P.2d 1060 (1992) (plurality opinion). "[U]nless a

criminal defendant can show bad faith on the part of the police, failure to preserve

potentially useful evidence does not constitute a denial of due process of law."

*Youngblood*, 488 U.S. at 58.

The presence or absence of bad faith turns on law enforcement's knowledge of the

exculpatory value of the evidence at the time it was lost or destroyed. *State v. Armstrong*,

188 Wn.2d 333, 345, 394 P.3d 373 (2017) (quoting *Cunningham v. City of Wenatchee*,

345 F.3d 802, 812 (9th Cir. 2003)). Law enforcement acting in compliance with

established policy regarding the evidence at issue is determinative of good faith. *See*

*Wittenbarger*, 124 Wn.2d at 477. A plaintiff must provide specific, nonconclusory

factual allegations that establish improper motive. *Armstrong*, 188 Wn.2d at 345.

In *Armstrong*, the defendant claimed the police acted in bad faith by failing to preserve a surveillance video after telling him that they would collect the video. *Id*. at 344-46. The video went uncollected due to an oversight on the part of the police. *Id*. at 346. Our Supreme Court held that the defendant failed to show bad faith because he presented no evidence the police had an improper motive. *Id*. At most, the defendant showed "the investigation was incomplete or perhaps negligently conducted, but that is not enough to show bad faith." *Id*.

Here, Leavens claims Detective Meyer acted in bad faith because Detective Meyer understood that the hair sample might have exonerated Leavens but waited weeks to collect the sample, which turned out to be of insufficient quantity for testing. As explained below, we conclude that Leavens has not established bad faith.

Similar to the defendant in *Armstrong*, Leavens fails to put forth specific, nonconclusory factual allegations that Detective Meyer acted with an improper motive. Detective Meyer testified that he researched the process. Based on his research, he elected to take a sample of Leavens' hair, rather than blood, because Rohypnol would be present in hair up to 90 days after ingestion. The fact that Detective Meyer collected an insufficient amount of hair to test for Rohypnol does not show an improper motive. Nor does a six-week delay between Leavens first asking to be tested and taking the sample

49

show an improper motive. Detective Meyer's failure to take a larger sample of hair was careless, but this is insufficient to show bad faith.

E.      INTERFERENCE WITH RIGHT TO SELF-REPRESENTATION

Leavens contends the trial court, court clerk, and jail interfered with his constitutional right to self-representation. He argues the trial court failed to consider four of his motions and abused its discretion by failing to ensure he had reasonable access to resources to help him prepare for his defense. He also contends we should abandon the practice of holding pro se litigants to the same standard as attorneys. We disagree with his arguments and address them in turn.

The Washington Constitution expressly guarantees criminal defendants the right to self-representation. WASH. CONST. art. I, § 22. The Sixth Amendment to the United States Constitution implicitly guarantees this right. *Faretta v. California*, 422 U.S. 806, 819, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975). Courts regard this right as "so fundamental that it is afforded despite its potentially detrimental impact on both the defendant and the administration of justice." *State v. Madsen*, 168 Wn.2d 496, 503, 229 P.3d 714 (2010). Improper denial of the right to represent oneself requires reversal, and no showing of prejudice is required. *Id*.

The right of self-representation is not a license for a pro se criminal defendant to shirk relevant rules of procedural and substantive law. *See State v. Jessup*, 31 Wn. App.

50

304, 310, 641 P.2d 1185 (1982) (citing *State v. Fritz*, 21 Wn. App. 354, 358-63, 585 P.2d

173 (1978)).  Rather, a pro se criminal defendant must comply with all applicable

procedural rules.  *State v. Smith*, 104 Wn.2d 497, 508, 707 P.2d 1306 (1985).

Leavens contends the trial court violated his right to self-representation in four

ways.  We discuss each argument separately.

### 1. *Pretrial motion for material witness warrant or deposition*

Leavens contends the trial court violated his right to self-representation and to

present a defense when it failed to consider his pretrial motion for material witness

assistance with respect to Ms. Snarr.  The State responds that we should not find any

violation where the record does not establish that Leavens served a lawfully issued

subpoena on Ms. Snarr.  We agree with the State.

A trial court may order a witness be deposed if the trial court finds that the witness

might be unable or prevented from attending trial, a material witness refuses to discuss

the case with either counsel, or there is good cause to take the deposition.  CrR 4.6(a).

Here, there was no basis in the record for the trial court, pretrial, to issue an order for Ms.

Snarr to be deposed.  The record shows that Ms. Snarr and Leavens are acquaintances on

friendly terms who drank together.

A trial court may issue a material witness warrant only on a showing that the

witness has material testimony and (1) has refused to submit to a deposition ordered by

the court, or (2) has refused to obey a lawfully issued subpoena, or (3) it may be

impractical to secure the presence of the witness by subpoena. CrR 4.10(a). Here, the

trial court never ordered Ms. Snarr to be deposed nor did Leavens ever make a pretrial

showing it would be impractical to secure Ms. Snarr's presence by subpoena. Again, the

record reflects that the two are acquaintances on friendly terms who drank together. To

prevail on this argument, therefore, Leavens must establish the second option, that Ms.

Snarr had refused to obey a lawfully issued subpoena.

The record does not establish that Ms. Snarr had been lawfully subpoenaed at the

time of Leavens' pretrial request or that she refused to comply with the subpoena if one

ever was served on her. There being no pretrial basis for issuance of a material witness

warrant for Ms. Snarr, we conclude that Leavens' first argument fails.

### 2. *Motion for* Brady *evidence*

Leavens next contends the trial court violated his right to self-representation by

failing to address his written *Brady* motion. We disagree.

Leavens filed a motion requesting the State disclose all *Brady* material before trial.

Rather than scheduling the motion through the clerk's office and writing the date in the

note for motion, Leavens wrote "available." CP at 138. The note for motion was marked

"received" by the superior court administrator's office on May 11, 2022, one month after

trial. CP at 138. Leavens never mentioned the motion during his many pretrial hearings

nor during trial. There is no evidence the trial court ever knew Leavens filed a *Brady* motion. The trial court did not violate Leavens' right to self-representation by failing to rule on a motion that was never properly noted or called to its attention. We conclude that his second argument fails.

### 3. *Posttrial motions for a new trial and to arrest judgment*

Leavens contends the trial court violated his right to self-representation by failing to address his posttrial motions for a new trial and to arrest judgment. We disagree.

The record shows, similar to his *Brady* motion, Leavens failed to properly note the motion for hearing. Rather than scheduling the motion through the clerk's office and writing the date in the note for motion docket, Leavens wrote "available." CP at 143. We conclude that his third argument fails.

### 4. *Reasonable access to State-provided resources*

Leavens argues the trial court abused its discretion by failing to ensure he had reasonable access to resources to help him prepare his defense. Specifically, he contends that in January and early February 2022 he (1) was barred from speaking to State witnesses, (2) was unable to make telephone calls from the jail, (3) did not have access to a telephone book, (4) did not have access to a dictionary, and (5) was only permitted to look at discovery for one hour per day. He also complains the jail would not allow him to bring one of his folders to the court on the first day of trial.

The State counters, arguing (1) we should not find reversible error because the record is silent as to whether Leavens' complaints in the months leading up to trial went unremedied, and (2) the court provided Leavens with reasonable access to resources. We agree with the State.

Article I, section 22 of the Washington Constitution affords a pretrial detainee who has exercised his constitutional right to represent himself a right of reasonable access to State-provided resources that will enable him to prepare a meaningful pro se defense. *State v. Silva*, 107 Wn. App. 605, 622, 27 P.3d 663 (2001). The *Silva* court further explained:

> What measures are necessary or appropriate to constitute reasonable access lie within the sound discretion of the trial court after consideration of all the circumstances, including, but not limited to, the nature of the charge, the complexity of the issues involved, the need for investigative services, the orderly administration of justice, the fair allocation of judicial resources (i.e., an accused is not entitled to greater resources than he would otherwise receive if he were represented by appointed counsel), legitimate safety and security concerns, and the conduct of the accused.

*Id.* at 622-23 (footnotes omitted).

Leavens points to these factors and contends the trial court should have taken broad measures to ensure his reasonable access to resources. As discussed below, we conclude the trial court took appropriate measures to afford Leavens with reasonable access to State-provided resources and therefore did not abuse its discretion.

54

First, contrary to Leavens' argument, the record shows he was able to speak to State witnesses and make telephone calls from jail. The prosecutor twice complained about Leavens attempting to contact State witnesses (in violation of a court order), casting doubt on his argument that he was unable to make telephone calls from the jail. Leavens also acknowledged he was able to make telephone calls from the jail when he told the court that "nobody picks up." RP (Jan. 20, 2022) at 21. In addition, the court-appointed investigator's invoice reflects that Leavens called him from jail 11 times between February and March 2022.

With regard to interviewing State witnesses, the prosecutor arranged for Leavens to interview State witnesses, even though Leavens had not provided a list of witnesses he wanted to interview. In the end, Leavens interviewed four State witnesses. And although Leavens represented to the trial court he would like to interview every single State witness, he made clear he did not want a continuance to do so.

Next, although Leavens complained about his lack of access to a dictionary and telephone book, and complained about his lack of time to review discovery, we will not assume that these issues went unremedied. We note that Leavens did not raise these issues in February or March, prior to the April trial.

With regard to his complaint that the jail would not allow him to bring one of his folders to the court on the first day of trial, we are not persuaded that this amounts to a

denial of his right to self-representation. Leavens had two folders with him, and the

folder he was not allowed to bring contained his witness list. Despite this, Leavens was

able to recall the names of his four witnesses, including Misty Duron and Patricia Snarr.

From the record, it is apparent that Leavens was able to intelligently discuss pretrial

matters, engage in jury selection, and provide a lengthy opening statement—all without

the folder containing his witness list. We conclude that his fourth argument fails.

*We are bound to hold pro se litigants to the same standard as attorneys*

Leavens contends we should abandon the practice of holding pro se litigants to the

same standard as attorneys. The State correctly responds that we must follow Supreme

Court precedent. *State v. Gore*, 101 Wn.2d 481, 486-87, 681 P.2d 227 (1984); *see also*

*State v. Jussila*, 197 Wn. App. 908, 931, 392 P.3d 1108 (2017). Our Supreme Court has

established that pro se litigants must comply with applicable rules and statutes, and that

we hold pro se litigants to the same standard as attorneys. *See In re Pers. Restraint of*

*Rhem*, 188 Wn.2d 321, 328, 394 P.3d 367 (2017); *In re Pers. Restraint of Bonds*, 165

Wn.2d 135, 143, 196 P.3d 672 (2008) (plurality opinion).

F.     CROSS-EXAMINATION OF RONALD

Leavens contends the trial court violated his constitutional right to present a

defense and right to confrontation by (1) making misleading statements about the scope

of cross-examination, and (2) limiting his cross-examination of Ronald. We disagree the

trial court made misleading statements and conclude that Leavens failed to adequately inform the trial court of why an incident, one week prior to the assault, was relevant to his defense.

As with the right to present a defense, the right to confront and cross-examine adverse witnesses is guaranteed by both the federal and state constitutions. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010) (quoting *State v. Darden*, 145 Wn.2d 612, 620, 41 P.3d 1189 (2002)). "A defendant's right to an opportunity to be heard in his defense, including the rights to examine witnesses against him and to offer testimony, is basic in our system of jurisprudence." *Jones*, 168 Wn.2d at 720 (citing *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)). The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination. *State v. Lee*, 188 Wn.2d 473, 487, 396 P.3d 316 (2017).

These rights are not absolute. *Id.* "'[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *Id.* (alteration in original) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986)). Courts may deny cross-

examination if the evidence sought is "'vague, argumentative, or speculative.'"  *Id.*
(quoting *Darden*, 145 Wn.2d at 621).  We review a claim of a denial of Sixth
Amendment rights de novo.  *Jones*, 168 Wn.2d at 719.  However, we review a limitation
of the scope of cross-examination for an abuse of discretion.  *Lee*, 188 Wn.2d at 486.  In
these situations, a trial court abuses its discretion when its decision is manifestly
unreasonable or based on untenable grounds or reasons.  *Id*.

Similarly, we review trial court rulings on whether evidence is relevant and
admissible for an abuse of discretion.  *State v. Jennings*, 199 Wn.2d 53, 59, 502 P.3d
1255 (2022).  When making these rulings, a trial court abuses its discretion if no
reasonable person would take the view adopted by the trial court.  *Id*.  When a trial
court's discretionary ruling excludes relevant evidence, the more the exclusion of that
evidence prejudices an articulated defense theory, the more likely we will find that the
trial court abused its discretion.  *State v. Duarte Vela*, 200 Wn. App. 306, 317, 402 P.3d
281 (2017) (citing *Jones*, 168 Wn.2d at 720).

1.      *The trial court's statements concerning the scope of cross-examination*

Leavens focuses on two statements the trial court made during and before trial as
violating his right to present a defense and right to confrontation:

> THE COURT: [Each party's job is][10] to present whatever they want in the trial. So the Court doesn't get involved in that. I simply make rulings as to whether things are admissible or not admissible if someone offers an exhibit or offers testimony or offers whatever it is. . . .

RP (Apr. 4, 2022) at 144-45.

> THE COURT: Okay. So before we pull the jury out here into courtroom, Mr. Leavens, we're going to have witnesses today, my understanding, the State's going to be putting on. So, again, when you go to question these witnesses, it's not a conversation and it's not a debate. They are questions and answers. So if you have a question, you ask the question. Whatever the witnesses say, that's the answer. So if you start to have a back and forth with the witness or if you're going to get into a debate with the witness, I'll cut you off and I'll remind you of our conversation. I'm telling you up front just to avoid that. Again, it is a question and answer. They say something you don't like in the answer, that's the way it is. That's how the courtroom works. So I don't want to hear you get into a debate or a conversation with somebody because that's not what we do in the courtroom, okay?

RP (Apr. 5, 2022) at 290.

The State argues the trial court was permitted to control the mode of questioning witnesses. We agree with the State.

With regard to the first statement, we are not persuaded the trial court violated Leavens' right to present a defense or right to confrontation. "Trial courts determine whether evidence is relevant and admissible." *Jennings*, 199 Wn.2d at 59. The trial

---

[10] The parties characterize this first comment as the court saying that it is *the State's* or *prosecutor's job* to introduce whatever they want. However, the transcript shows that the trial court was discussing "each party's" burden to put forth witnesses and exhibits, and not referring to only the State or prosecutor.

court was correct in telling Leavens that each party was responsible for putting on their own witnesses and exhibits, and that the trial court's job is to rule on admissibility.

With regard to the second comment, we are not persuaded the trial court misled Leavens that his ability to cross-examine State witnesses would be limited. Instead, the court informed Leavens that he could not use cross-examination to testify or argue with the witnesses, which was a correct statement of the law and within its discretion. *See Lee*, 188 Wn.2d at 486. Moreover, the trial court has broad discretion to make trial management decisions, including "'the mode and order of interrogating witnesses and presenting evidence.'" *State v. Dye*, 178 Wn.2d 541, 547, 309 P.3d 1192 (2013) (quoting ER 611(a)).

We conclude that the trial court's comments did not improperly limit Leavens' right to confrontation. Rather, its comments were correct statements of the law and were within its broad discretion to manage how witnesses are questioned.

2.      *The trial court's restriction of Leavens' cross-examination of Ronald*

Leavens contends the trial court violated his right to confrontation and his right to present a defense when it refused to allow him to ask Ronald whether he was angry at their mother because the weekend before the assault she had refused to give him money to program his car keys.

The rulings Leavens complains of occurred during his cross-examination of his

brother:

> Q.  (By Mr. Leavens)  We established that you had been staying and paying rent.  Now, leading up to this . . . fateful week, I'd say the event I'm going to ask you about is you had keys made for your car on the Labor Day weekend prior to this?
> [THE PROSECUTOR]:  Objection.  Relevance.
> THE COURT:  Sustained.
> THE WITNESS:  Yes, I did.
> THE COURT:  That's okay, sir.  I sustained the objection.
> MR. LEAVENS:  So, Your Honor, I'm trying to establish a fact of my defense and leading up to showing what the atmosphere was in the house.
> THE COURT:  Well, at this point, I don't have any reason to know what the atmosphere—I don't have any reason to believe that the atmosphere—
> MR. LEAVENS:  Okay.
> THE COURT:  —before this date had anything to do with the incident.  If you want to ask questions about the date in question, let's go from there and see where that takes us.

RP (Apr. 5, 2022) at 328-29.  Leavens then questioned his brother about photographs of

his brother's bedroom and slippers.

Later, Leavens asked his brother whether he was "mad at mom because she

wouldn't give you any more money for those keys on Labor Day weekend, that previous

weekend?"  RP (Apr. 5, 2022) at 361-62.  The prosecutor objected to "[f]acts not in

evidence," which the court sustained.  RP (Apr. 5, 2022) at 362.

The State contends (1) Leavens failed to adequately inform the trial court of the relevancy of the atmosphere in the house the week before the assault, and (2) Leavens failed to lay an adequate foundation for offering an "other suspect" defense. Because we agree with the State's former argument, we do not address the latter.

Under ER 103(a)(2), error may not be predicated upon a ruling that excludes evidence unless a substantial right of the party is affected, *and* "the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked." "An offer of proof serves three purposes: it informs the court of the legal theory under which the offered evidence is admissible; it informs the judge of the specific nature of the offered evidence so that the court can assess its admissibility; and it creates a record adequate for review." *State v. Ray*, 116 Wn.2d 531, 538, 806 P.2d 1220 (1991), *abrogated on other grounds by State v. Crossguns*, 199 Wn.2d 282, 505 P.3d 529 (2022). An offer of proof is not required, however, if the substance of the excluded evidence is apparent from the record. *Id*. at 539.

We are not persuaded the trial court abused its discretion when it sustained the prosecutor's relevance objection. Leavens explained he was asking his brother about the keys to establish "what the atmosphere was in the house" the weekend before the assault. RP (Apr. 5, 2022) at 328. The trial court sustained the State's relevancy objection and

explained it had no reason to believe the atmosphere in the house the weekend before the assault was relevant and told Leavens he should focus on the day of the event.

Leavens points to nothing in the record that would make apparent to the trial court the relevancy of the atmosphere in the house the weekend before the assault. Rather, he argues he told the court he was trying to establish a fact of his defense. This is not sufficient. Rather, under ER 103(a)(2), it was incumbent on Leavens to better explain the relevancy of the answer he sought to elicit by making an offer of proof.

Similarly, the trial court did not err when it sustained the objection to the second question, noted above. Although "facts not in evidence" was not the proper objection, we may sustain a trial court's discretionary evidentiary ruling on any proper ground. *State v. Arndt*, 194 Wn.2d 784, 799, 453 P.3d 696 (2019). Because Leavens still had not explained the relevancy of his brother being mad at their mother the weekend before the assault, the question still was not relevant.

Moreover, the trial court did not prevent Leavens from eliciting evidence of his brother's motive to kill their mother. Leavens actually did introduce evidence to support his theory that his brother assaulted their mother and had a motive to do so. The jury heard that Ronald paid rent to live at his mother's house, that he wanted her house, and that he told Leavens, three times the month before, that the house would be his. These facts allowed Leavens to argue his theory of the case.

We conclude that the trial court did not violate Leavens' constitutional right to confront a witness or to present a defense.

G.     CUMULATIVE ERROR

Leavens argues that cumulative error denied him his constitutional right to a fair trial and warrants reversal.  We disagree.

Under the cumulative error doctrine, the defendant must show that the combined effect of multiple errors requires a new trial.  *State v. Clark*, 187 Wn.2d 641, 649, 389 P.3d 462 (2017).  Having found no error, this doctrine is inapplicable here.

SAG ISSUE I:  TABLE OF CONTENTS AND STATEMENTS OF FACT

RAP 10.10 permits a defendant to file a pro se statement of additional grounds for review (SAG) if the defendant believes his appellate counsel has not adequately addressed certain matters.  Our review of an SAG, however, is subject to several practical limitations.  For example, we consider only issues raised in an SAG that adequately inform us of the nature and occurrence of the alleged errors.  *State v. Alvarado*, 164 Wn.2d 556, 569, 192 P.3d 345 (2008).  In addition, we only consider arguments that are not repetitive of briefing.  RAP 10.10(a).  Finally, issues that involve facts or evidence not in the record are properly raised through a personal restraint petition, not an SAG.  *Alvarado*, 164 Wn.2d at 569.

Leavens filed a 32-page SAG, accompanied by an 88-page appendix consisting of photographic exhibits, hearing transcripts, and other documents that are not included in the clerk's papers. To the extent his SAG and appendix raise issues that involve facts and evidence not in the record, those issues are properly raised in a personal restraint petition. *Id.*

The table of contents in Leavens' SAG includes the following five issues with subissues that seem to include argument: (1) "unsupported probable cause and initial bias apparent at first appearance," (2) "a charge that fails to constitute the required 'beyond a reasonable doubt' to charge statute," (3) "arrest and incarceration completely infringe on 14th Amendments presumption of innocence, and ability to prepare a proper defense," and (4) "that equitable fact finding for the furtherance of justice was sidelined for an unsupported preclusion of guilt." SAG at i-ii (capitalization omitted).

Leavens' SAG also contains sections entitled "issues and statement of facts" and "statement of declarative facts." SAG at 14-17, 19-21 (capitalization omitted). In both of these sections, he repeats his theory that Ronald drugged him. He also contends the trial court should have compelled the testimony of Ms. Snarr and Heather Bach.

We reviewed the issue related to the compulsion of Ms. Snarr's testimony based on the briefing above. We decline to review this SAG issue because we only consider arguments that are not repetitive of briefing. RAP 10.10(a).

With regard to the testimony of Ms. Bach, Leavens fails to identify an error for us to review. RAP 10.10(c). Leavens never asked the trial court to compel her testimony. Leavens did tell the court that he wished to call Ms. Bach to testify, and the prosecutor indicated the State would provide Leavens with blank subpoena forms. However, the record does not show that Leavens ever subpoenaed Ms. Bach nor does it show any other requests or motions to compel Ms. Bach's testimony. Accordingly, we decline review of this issue.

The remaining issues raised in the table of contents and fact sections do not adequately inform us of the nature and occurrence of the alleged errors. RAP 10.10(c); *Alvarado*, 164 Wn.2d at 569. To the extent these sections raise errors, we decline to review them.

SAG ISSUE II: ISSUE AND ASSIGNMENT OF ERROR SECTION

Leavens' SAG contains a section entitled, "issue and assignment of error," with the following list of alleged errors and issues:

> 1. In the manner of a summary prosecution, this trial court errored by impermissivley [sic] shifting the burden of proof to the defendant, Edward Leavens. Only by accusation by lone accuser Ronald Leavens did probable cause become established.
> 2. Constitutional violations contributed to conviction of someone who is actually legally, procedurally innocent.
> 3. Unconscionable tactics were applied during this prosecution. A "pro se" defendant is defined as "of one's self" not "by one self" left

66

without hearing notifications. Evens [sic] the April 4th jury trial stand-in counsel gave Edward Leavens no notice or information.

4. At what point does a prosecution resemble a persecution, as an ethical conundrum, therefore abandoning its obligation to remain unbiased and seek justice with diligence.

5. Trial court erred by failing to examine factual findings responsibly gathered by first responders. Theses exhibits and articles remain unexamined including a PharoPhoto to Go scan of the entire house. Articles and evidences that remain inconclusive.

6. Edward Leavens was denied the equal protections that the Fourteenth Amendment, that state, that no person shall be denied the same protection of law enjoyed by others.

7. Judge Harold Clarke III in closing moments of sentencing wonders aloud that "you have some culpability in this" and that there is plenty of evidence. Judge Clarke than [sic] only refers to surgery photo's [sic] and nothing else. The same photos I objected to for their inflammatory nature.

8. Trial court erred by mistaken belief that repeatedly presenting a case lacking a definite theory, one not inferred by overwhelming allegations.

9. When an inference supports an element of a crime. Due process requires the presumed fact be inferred from validation by the proof of basic fact.

10. Overwhelming presumption of guilt or innocence, does in no manner equate to a conclusive result. Especially when direct responsibly gather evidence conflicts with State's witness.

ISSUE: Trial court only suggest repeatedly of satisfying its burden of proof. Only by accusation did this continue defying the standard of "proven beyond a reasonable doubt."

I persist, can the element of basic fact by allegation be proved conclusively or with moral certainty. The irregularities in attaining this verdict will remain questionable.

Its my contention that this verdict be dismissed or reversed with prejudice.

SAG at 1-3.

Leavens does not provide argument or authority for any of these bare allegations

of error. Again, we consider only issues raised in an SAG that adequately inform

us of the nature and occurrence of the alleged errors. *Alvarado*, 164 Wn.2d at 569;

RAP 10.10(c). Accordingly, we decline review of these alleged errors.

SAG ISSUE III: FAILURE TO CALL WITNESSES AND CONSIDER EVIDENCE

Leavens contends the trial court erred by (1) failing to call forensic investigators

Trayce Boniecki and Lyle Johnston to testify, (2) excluding evidence of inconsistent

statements made by Ronald, and (3) failing to consider the evidence. We disagree with

his arguments and address them in turn.

First, the trial court did not err by failing to call the forensic investigators to

testify. ER 614(a) permits, but does not require, the trial court to call witnesses on its

own motion or on the motion of a party where necessary in the interests of justice.

However, Leavens never moved the trial court to call the forensic investigators to testify

and only raised the issue of their testimony in his notice of discretionary review filed over

one month after trial. Under these circumstances, Leavens fails to identify a reviewable

error. RAP 10.10(c).

Both investigators were included on the State's witness list, and the prosecutor

arranged for Leavens to interview them. In the first joint trial management report, the

State indicated it would call both investigators to testify, but in a later report the State

indicated it would not call them to testify. However, this was not error. Nothing in

CrR 4.7(a), which governs the prosecutor's discovery obligations, requires the State to

call every witness on its witness list. If Leavens believed the forensic investigators'

testimony was important to his case after his interview, he could have amended his

witness list to include the forensic investigators and called them to testify himself.

Second, Leavens fails to identify a reviewable error regarding the evidence of

Ronald's interview with investigators. RAP 10.10(c). Leavens seems to contend that

Ronald made contradictory statements in his 911 call and his video-recorded interview

with law enforcement. However, only the 911 call was admitted as evidence and played

for the jury. No video of Ronald's interview with law enforcement was admitted as

evidence during trial nor is the video included in the record on appeal. Leavens'

proposed list of exhibits included in the joint trial management report does not include

any mention of the video recording of Ronald's interview with law enforcement.[11] Under

these circumstances, Leavens fails to identify an error for us to review. RAP 10.10(c).

Resolution of this issue may involve evidence or facts not in the record, so the

appropriate method for addressing the issue is through a personal restraint petition.

*Alvarado*, 164 Wn.2d at 569.

---

[11] Some of the pages in the joint trial management report are faded to the point that the handwriting is illegible.

Last, Leavens' contention that the trial court failed to consider the evidence also fails to identify a reviewable error. RAP 10.10(c). The trial court is tasked with determining whether evidence is relevant and admissible. *Jennings*, 199 Wn.2d at 59. The jury's role is to weigh the evidence to determine whether the State has met its burden to prove each element of the crime beyond a reasonable doubt. *Crossguns*, 199 Wn.2d at 297. Leavens does not identify a particular piece of evidence that the court should have considered or what he means by "considered." If he was concerned with the relevance or admissibility of a particular piece of evidence, he should have objected during trial. To the extent he is arguing that his conviction was based on insufficient evidence because the State relied solely on Ronald's testimony, he is incorrect. The State introduced numerous pieces of evidence that support Leavens' conviction—including the location data from his cell phone, his DNA on the hammer, flight after the crime, flight from arrest, numerous incredulous and inconsistent statements he made, and the fact that Ronald called 911 rather than allowing their mother to bleed to death.

No. 38909-0-III
*State v. Leavens*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Lawrence-Berrey, C.J.

WE CONCUR:

_____        _____
Pennell, J.                             Cooney, J.

71